## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ESTUARY TRANSIT DISTRICT AND TEAMSTERS 671 HEALTH SERVICE & INSURANCE PLAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HARTFORD HEALTHCARE CORPORATION, HARTFORD HOSPITAL, HARTFORD HEALTHCARE MEDICAL GROUP, INC., INTEGRATED CARE PARTNERS, LLC,<br><br>Defendants. | Case No.: |

## COMPLAINT WITH JURY TRIAL DEMANDED

Plaintiffs Estuary Transit District and Teamsters 671 Health Service & Insurance Plan (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendants Hartford HealthCare Corporation ("HHC"), Hartford Hospital, Hartford Healthcare Medical Group, Inc. ("HHMG"), and Integrated Care Partners, LLC ("ICP") (collectively, "Defendants"), for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).

## I.  INTRODUCTION

1.  This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, for unlawful monopolization, restraint of trade, and price fixing against HHC, a dominant hospital provider in Connecticut, and certain of HHC's subsidiaries, including: Hartford Hospital, the largest hospital in Hartford; HHMG, HHC's network of outpatient providers; and ICP, HHC's wholly owned network of purportedly "independent" healthcare providers. As described in more

detail below, Defendants have engaged in a continuing scheme to suppress competition and inflate prices for healthcare services.

2.       HHC describes itself as "Connecticut's most comprehensive health care network," employing over 41,000 professionals serving 500 locations in 185 towns and cities, and generating over $5 billion per year in revenue.[1] HHC owns Hartford Hospital, the largest hospital in Hartford, and St. Vincent's Medical Center, the second largest hospital in Bridgeport, as well as several other hospitals located in smaller towns and cities in Connecticut, many of which are the only hospitals serving those communities. HHC also owns HHMG, "a multi-specialty group encompassing more than 800 physicians and advanced practitioners in more than 30 specialties and in more than 350 locations."[2] Additionally, HHC, through its wholly owned subsidiary ICP, coordinates the pricing and other business decisions of thousands of purportedly independent physician practices providing a wide range of outpatient healthcare services around Connecticut ("ICP Providers"). After coercing providers to join ICP, HHC prevents them from joining other networks or negotiating separately with health plans. As such, health plans cannot assemble sufficiently comprehensive and commercially viable provider networks without including at least some of HHC's facilities and the independent practices HHC/ICP represents.

3.       As described in more detail below, healthcare markets operate differently than the markets for many consumer goods and services. This is because those who choose the services to be provided (typically, the patient and/or provider) are different than the ones who pay directly for the services (typically, the health plan). Thus, price competition typically comes in the form of

---

[1] Hartford HealthCare, *About Hartford HealthCare*, https://hartfordhealthcare.org/about-us (last accessed 6/13/24).

[2] Hartford HealthCare, *Hartford HealthCare Medical Group*, https://hartfordhealthcare.org/locations-partners/hartford-healthcare-medical-group (last accessed 6/13/24)

providers competing to be included in a "network" offered by a health plan. Those providers who offer lower prices to be included in the network then typically get more patients because the health plan, in turn, will steers its patients to "in network" providers. The health plans then market their networks to attract customers. To be marketable, networks must offer a sufficient number of inpatient and outpatient providers and facilities. Defendants have used a variety of tactics to reduce or eliminate competition at the network level that would have lowered the prices charged for healthcare services.

4.      Beginning no later than June 2020 and continuing until the present, Defendants have abused their market power to carry out a multifaceted anticompetitive scheme with the purpose and effect of foreclosing healthcare competition and extracting supracompetitive prices from Plaintiffs and other health plans. Defendants' scheme includes at least the following:

(a)      Imposing "all or nothing" conditions on payers by requiring health plans who want to include certain must-have facilities or providers in their networks to include all or substantially all of Defendants' facilities, thereby preventing health plans from assembling more cost-effective provider networks;

(b)      Imposing anti-tiering and anti-steering provisions in HHC's contracts with health plans that prevent those health plans from incentivizing their members to seek healthcare from lower cost providers;

(c)      Coercing physician practices to become ICP Providers and then imposing *de facto* exclusive contracts which prevent them both from joining networks that could compete against Defendants and from negotiating separately with health plans; and

(d)      Trapping referrals within the ICP network by forcing physicians to refer exclusively or nearly exclusively to Defendants' facilities and threatening to cut off physicians who do not refer exclusively to Defendants.

5.      Defendants' scheme has substantially foreclosed competition in both general acute care inpatient hospital services and outpatient medical services in several distinct geographic markets within Connecticut. This, in turn, has artificially inflated healthcare costs and prices paid

by Plaintiffs and the proposed Class while also impairing the quality of the services provided, thus injuring Plaintiffs and the proposed Class.

6.      That is why, for example, a colonoscopy—a generally homogenous, non-urgent and shoppable procedure—costs $3,800 at HHC's St. Vincent's Medical Center while its competitor Bridgeport Hospital, located a few short miles away, charges only $1,400 or 63% less than HHC. Similarly, a colonoscopy at HHC's Hartford Hospital costs $2,200 while HHC's competitor in Hartford, St. Francis Hospital and Medical Center ("St. Francis") charges only $1,800 or 18% less than HHC. But for the unlawful conduct complained of herein, Defendants would be unable to charge such supracompetitive prices.

7.      Plaintiffs bring this action on behalf of themselves and other health plans to enjoin Defendants' ongoing anticompetitive conduct and to recover damages for the injuries they have sustained as a result of Defendants' artificially inflated prices.

## II.   PARTIES

### A.   Plaintiffs

8.      Plaintiff Estuary Transit District d/b/a River Valley Transit ("RVT") is a transit district headquartered in Middletown, Connecticut, that provides a variety of public transportation resources, including traditional buses, trolleys, shuttles, taxis, and paratransit services, and serves 16 municipalities throughout Middlesex County and parts of New London County, Connecticut. During all relevant times RVT has had and continues to have a self-funded health plan for its employees and their families. RVT has paid or reimbursed artificially inflated prices directly to one or more Defendants for GAC and Outpatient Services due to Defendants' unlawful conduct challenged herein.

9.      Teamsters 671 Health Service & Insurance Plan is headquartered in Bloomfield, Connecticut and provides health benefits for the members of Teamsters Local 671 and their

families. During all relevant times, Teamsters 671 Health Service & Insurance Plan has had and continues to have a self-funded health plan operated for the benefit of the members of Teamsters Local 671 and their families. Teamsters 671 Health Service & Insurance Plan has paid or reimbursed artificially inflated prices directly to one or more Defendants for GAC and Outpatient Services in the Relevant Markets due to Defendants' unlawful conduct challenged herein.

**B.    Defendants**

10.    Defendant Hartford HealthCare Corporation ("HHC") is a domestic nonprofit corporation organized under the laws of Connecticut. Its principal office is located in the City of Hartford, County of Hartford, and State of Connecticut. HHC is the sole member of defendant Hartford Hospital. HHC, as used herein, will refer collectively to Hartford HealthCare Corporation and its subsidiaries, including its defendant subsidiaries set forth below.

11.    Defendant Hartford Hospital is a domestic nonprofit corporation organized under the laws of Connecticut. Its principal office is located in the City of Hartford, County of Hartford, and State of Connecticut. HHC is the sole member of Hartford Hospital and Defendant Integrated Care Partners, LLC, a domestic *for-profit* limited liability corporation organized under the laws of Connecticut.

12.    Despite having the tax status of a non-profit entity, HHC's profit margins are projected to be over 8%, resulting in approximately $400 million in annual profits, which are, *inter alia*, used to pay HHC executives outsized compensation packages often exceeding millions of dollars per year.

13.    Defendant Hartford HealthCare Medical Group, Inc. ("HHMG") is a domestic nonprofit corporation organized under the laws of Connecticut. Its principal office is located in the City of Hartford, County of Hartford, and State of Connecticut.

14.     Defendant Integrated Care Partners, LLC ("ICP") is a domestic for-profit limited liability corporation organized under the laws of Connecticut. Its principal office location is located in the City of Hartford, County of Hartford, and State of Connecticut. HHC is the sole member of ICP.

## III.     AGENTS AND CO-CONSPIRATORS

15.     Various other persons or entities not named as defendants herein may have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These other persons or entities may have facilitated, adhered to, participated in, or communicated with others regarding the alleged conspiracy in restraint of trade in or in furtherance of Defendants' monopolization of the Relevant Markets alleged herein. Plaintiffs reserve the right to name some or all these persons or entities as defendants at a later date.

16.     Whenever this Complaint refers to an act, deed, or transaction of any business entity, the allegation means that the business entity engaged in that act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## IV.     JURISDICTION AND VENUE

17.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Plaintiffs seek statutory damages and injunctive relief from ongoing violations of the antitrust laws of the United States, specifically, Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

18.     This Court has subject matter jurisdiction over the federal antitrust law claims alleged in Counts One through Six pursuant to 28 U.S.C. § 1331 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

19.     This Court has personal jurisdiction over each Defendant because each Defendant: resides in this District; transacted business in this District; and/or committed overt acts in furtherance of the illegal scheme and conspiracy alleged herein in this District.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants resided, transacted business, were found, or had agents in this District; most or all of the events and effects giving rise to these claims occurred in this District; and/or a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

## V.     BACKGROUND: HEALTHCARE, HOSPITALS, AND INSURANCE MARKETS

### A.     The U.S. Healthcare System

21.     Healthcare in the United States is expensive. Over $4.5 trillion dollars is spent on healthcare in the United States each year.[3] The largest component of that spending goes to hospital



Percent of GDP spent on health, 1980–2021*

---

[3] *The Nation's Health Dollar ($4.5 Trillion), Calendar Year 2022: Where It Went*, Ctrs. for Medicare and Medicaid Servs., Off. of the Actuary, Nat'l Health Stats. Grp., https://www.cms.gov/files/document/nations-health-dollar-where-it-came-where-it-went.pdf (last accessed 6/13/24).

services, which represents approximately 30% or $1.35 trillion per year.[4] Connecticut residents alone spend over $15 billion a year on hospital services.[5]

22.     According to data from the Organization for Economic Co-Operation and Development ("OECD"), the United States is an outlier when it comes to healthcare spending, representing nearly 18% of gross domestic product—nearly twice that of other wealthy, industrialized nations.

23.     The United States also spends more per capita on healthcare than other wealthy, industrialized countries. The United States spends $12,555 on healthcare per person compared to an average of $6,414 across all developed nations.[6]

---

[4] *NHE Fact Sheet*, Ctrs. for Medicare and Medicaid Servs., https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/nhe-fact-sheet (last accessed 6/13/24).

[5] *See* Ctrs. for Medicare and Medicaid Servs., Off. of the Actuary, Nat'l Health Stats. Grp., https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/state-provider (last accessed 6/13/24).

[6] *How Does the U.S. Healthcare System Compare to Other Countries?*, Peter G. Peterson Foundation (July 12, 2023), https://www.pgpf.org/blog/2023/07/how-does-the-us-healthcare-system-compare-to-other-countries (last accessed 6/13/24).





24. Furthermore, although the United States spends more on healthcare than other developed countries spend, the quality of healthcare received in the United States is worse than that received in other developed countries.

25. The United States has fewer practicing physicians per capita, resulting in fewer physician visits per capita. There are 2.6 physicians per 1,000 people in the United States versus an average of 3.7 across all developed nations; and Americans visit their doctors 4.0 times a year versus an average of 5.7 visits per year across all developed nations.[7]

---

[7] Munira Z. Gunja et al., *U.S. Health Care from a Global Perspective, 2022: Accelerating Spending, Worsening Outcomes*, The Common Wealth Fund (Jan. 31, 2023), https://www.commonwealthfund.org/publications/issue-briefs/2023/jan/us-health-care-global-perspective-2022 (last accessed 6/13/24).





Physician consultations in all settings per capita

Notes: Data for UK not available. 2021 data for AUS and NOR; 2020 data for FRA, GER, KOR, NETH, and SWE; 2019 data for CAN and JPN; 2017 for NZ and SWIZ; 2011 data for US. OECD average reflects the average of 37 OECD member countries, including ones not shown here.

Data: OECD Health Statistics 2022.



Practicing physicians per 1,000 population

Notes: 2021 data for CAN, GER, NZ, NOR, SWIZ, and UK; 2020 data for AUS, FRA, JPN, KOR, and NETH; 2019 data for SWE and US. OECD average reflects the average of 31 OECD member countries, including ones not shown here.

Data: OECD Health Statistics 2022.

Source: Munira Z. Gunja, Evan D. Gumas, and Reginald D. Williams II, *U.S. Health Care from a Global Perspective, 2022: Accelerating Spending, Worsening Outcomes* (Commonwealth Fund, Jan. 2023). https://doi.org/10.26099/8zjy-yc74

26.     When Americans do get sick, the United States has fewer available hospital beds to accommodate them, and Americans' hospital stays are on average shorter than the average across developed nations. Specifically, whereas there are 2.8 hospital beds per 1,000 people in the United States, there is an average of 4.3 hospital beds per 1,000 people across developed nations. And although the average hospital stay in the United States is 4.8 days, the average hospital stay across developed nations is 7.3 days.[8]

---

[8] *Id.*





Notes: Data reflect average length of stay for inpatient care for all hospitals. 2021 data for NOR; 2020 data for CAN, FRA, GER, KOR, NETH, SWE, and SWIZ. 2019 data for AUS and NZ; 2018 data for UK; 2010 data for US. Data for JPN not available. OECD average reflects the average of 36 OECD member countries, including ones not shown here, where data are available.

Data: OECD Health Statistics 2022.

Notes: 2021 data for NZ and UK; 2020 data for CAN, FRA, GER, JPN, KOR, NETH, NOR, SWE, and SWIZ; 2019 data for US; 2016 data for AUS. OECD average reflects the average of 38 OECD member countries, including ones not shown here, with available data.

Data: OECD Health Statistics 2022.

Source: Munira Z. Gunja, Evan D. Gumas, and Reginald D. Williams II, *U.S. Health Care from a Global Perspective, 2022: Accelerating Spending, Worsening Outcomes* (Commonwealth Fund, Jan. 2023). https://doi.org/10.26099/8ejv-yc74

27.    As a result, despite spending more on healthcare than other developed countries, the United States has decidedly worse healthcare outcomes than other countries.[9]

28.    For example, the United States has lower life expectancies, with the average American surviving 77.0 years compared to an average of 80.4 years across developed nations.[10]

---

[9] *How Does the U.S. Healthcare System Compare to Other Countries?*, Peter G. Peterson Foundation (July 12, 2023), https://www.pgpf.org/blog/2023/07/how-does-the-us-healthcare-system-compare-to-other-countries (noting "despite higher healthcare spending," "[t]he United States actually performs worse in some common health metrics like life expectancy, infant mortality, and unmanaged diabetes) (last accessed 6/13/24).

[10] Gunja et al., *U.S. Health Care from a Global Perspective, 2022, supra* note 7.



29.     The United States also experiences 336 avoidable deaths per 100,000 people compared to an average of 225 across developed nations.[11]



---

[11] *Id.*

30.     As demonstrated above, Americans do not spend more on healthcare because they are receiving more or better healthcare; they spend more because healthcare in the United States is more expensive. One of the primary reasons is that hospital markets throughout the United States have become increasingly concentrated, resulting in less competition and higher prices for patients and payers.

31.     In 2020, the Medicare Payment Advisory Commission reviewed published research on hospital consolidation and concluded that the "preponderance of evidence suggests that hospital consolidation leads to higher prices for commercially insured patients."[12]

32.     These effects are even more pronounced in rural areas. As stated in a July 9, 2021 Executive Order by President Biden: "Hospital consolidation has left many areas, particularly rural communities, with inadequate or more expensive healthcare options."[13]

33.     At the same time, the lack of competition resulting from hospital consolidation has also resulted in a lower quality of care.[14]

**B.      Health Insurance and the Two Stages of Hospital Competition**

34.     There are two basic types of private health plans: fully insured plans (*i.e.*, in which members or their employers pay a fixed premium to a health insurer to cover the members' medical expenses) and self-insured plans (*i.e.*, in which employers assume the financial risks of providing healthcare benefits to their employees by offering their own health plan).

---

[12] Medicare Payment Advisory Commission, *Report to the Congress: Medicare Payment Policy*, at 46 (March 2020), https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/mar20_entirereport_sec.pdf (last accessed 6/13/24).

[13] Executive Order No. 14036, *Promoting Competition in the American Economy* (July 9, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/ (last accessed 6/13/24).

[14] Nancy D. Beaulieu, *et al*., *Changes in Quality of Care after Hospital Mergers and Acquisitions*, The New England J. of Med. (Jan. 1, 2020). https://www.nejm.org/doi/full/10.1056/NEJMsa1901383 (last accessed 6/13/24).

35.     In the case of fully insured plans, health insurers assemble a network of providers whose services will be provided to members at negotiated prices set by contracts between the health insurer and the provider, referred to as "allowed amounts." These providers with whom the health insurer has contracted are referred to as "in-network" providers.

36.     In the case of self-insured plans, employers typically contract with a health insurer to gain access to the health insurer's network of providers whose services will also be provided at the same prices (*i.e.*, allowed amounts) negotiated between the health insurer and the provider. When marketing access to its network to self-insured plans, health insurers are referred to as "network vendors."

37.     Both fully insured and self-insured health plans typically encourage their members to utilize in-network providers by denying coverage or requiring members to pay higher copays or coinsurance when members receive services from providers that are not in-network, referred to as "out-of-network" providers. As a result, in a properly functioning hospital market, the primary source of price competition comes at the network level, where health care providers (*e.g.*, hospitals, outpatient clinics) compete to be included in a health insurer's network while health insurers compete to create the most comprehensive and cost-efficient networks.

38.     However, the unique structure and mechanics of the hospital services market enable larger hospital systems like HHC to unreasonably restrain trade using unduly restrictive negotiations and agreements with health plans.

39.     Unlike other product/service markets, "consumers" in the hospital services market (*i.e.*, patients) do not negotiate, and in most cases do not even know prior to "purchase" (*i.e.*, treatment), the prices of the products and services they are consuming. Even their physicians, who

often play a pivotal role in making treatment decisions, typically do not know or consider the prices that their patients will ultimately pay for hospital services.

40.     Furthermore, most patients typically pay only a small portion of the price of their treatment, with some other payor—typically, a health plan offering private health insurance (*e.g.*, a commercial insurer, self-insured employer) or Medicare/Medicaid—footing most of the price for the hospital services received. Thus, in the case of patients with private health insurance, it is the health plan that directly purchases hospital services for the benefit of its members, whose claims are processed and administered by the insurer or, in the case of a self-insured employer, a third-party administrator ("TPA").

41.     As a result, rather than compete with one another on the basis of price and quality to attract patients, hospitals compete in two separate stages. In the first stage, hospitals compete with one another for inclusion in health plans' provider networks so they can be deemed an "in-network" provider. In the second stage, a subset of in-network providers compete with one another to attract patients.[15]

42.     Whereas competition in the first stage—which involves health plans that are more likely to be responsible for charging and paying for hospital services—focuses primarily on

---

[15] *See generally*, Gregory Vistnes, *Hospitals, Mergers, and Two-Stage Competition*, 67 Antitrust L.J. 671 (2000); Robert Town & Gregory Vistnes, *Hospital Competition in HMO Networks*, 20 J. of Health Econ., No. 5 (2001), https://doi.org/10.1016/S0167-6296(01)00096-0 (last accessed 6/13/24); Cory; Cory Capps, David Dranove, & Mark Satterthwaite, *Competition and Market Power in Option Demand Markets*, 34 The RAND J. of Econ., 737 (2003), https://www.kellogg.northwestern.edu/faculty/satterthwaite/research/2003-0515%20Final%20for%20RAND.pdf (last accessed 6/13/24); Martin Gaynor, Kate Ho, & Robert Town, *The Industrial Organization of Health Care Markets*, 53 J. of Econ. Literature, 235 (2015), https://www.aeaweb.org/articles?id=10.1257/jel.53.2.235 (last accessed 6/13/24); Matthew Lewis & Kevin Pflum, *Diagnosing Hospital System Bargaining Power in Managed Care Networks*, 7 Am. Econ. J.: Econ. Pol'y 243, (2015), https://www.aeaweb.org/articles?id=10.1257/pol.20130009 (last accessed 6/13/24).

negotiated prices (*i.e.*, "allowed amounts"), competition in the second stage—which involves patients that are more likely to be responsible for a much smaller portion of the overall price—focuses primarily on quality (*e.g.*, better hospital facilities or amenities). For these reasons, competition in the first stage is more likely to be affected by anticompetitive conduct and, thus, is most relevant for antitrust purposes.

43.     During the first stage of competition, health plans negotiate directly with hospitals for inclusion in the health plans' networks. Hospitals offer an extremely large set of products and services. Accordingly, rather than negotiate on a service-by-service basis, health plans negotiate with hospitals for bundles of services that will then be available to those health plans' members as in-network benefits. Thus, for any service in that bundle for which a health plan's member receives, the health plan will pay the hospital the allowed amount for that service, less any patient responsibility (*e.g.*, copay, deductible, coinsurance).

44.     Health plans are incentivized to create the broadest and highest quality network at the lowest costs possible to attract employers or individuals to purchase their insurance products or to contract for access to their provider network. If a health plan wishes to offer a commercially viable provider network that it can market to its own insureds or to self-insured employers, that provider network must include a comprehensive bundle of inpatient and outpatient services that members across the region can rely upon to meet their healthcare needs. Health plans must avoid gaps in their service or geographic coverage, otherwise they will not be attractive to insureds and employers who live and work in those areas with gaps. State laws may also require health plans to offer coverage in every region of the state to ensure network adequacy.

**C.     Methods Used by Health Plans to Lower Healthcare Costs**

45.     In geographic areas where there is only one hospital, that hospital must be included in a health plan's network if the health plan wants to offer people in that geographic area health

insurance or wants to offer employers in that geographic area access to its provider network. Such hospitals are referred to as "must have" hospitals.

46.     However, where there is more than one hospital providing inpatient and/or outpatient services, health plans may selectively choose to include only certain services or facilities from a particular hospital provider or even exclude a particular hospital provider altogether. For example, a health plan could choose to include in its network the GAC and Outpatient Services of one hospital provider in a geographic area but include only the GAC Services of the same hospital provider in a different geographic area, obtaining lower-priced and/or higher-quality Outpatient Services from a different hospital provider in that geographic area. In this way, health plans may mix-and-match healthcare providers within and across geographic areas to maximize cost savings and quality of care.

47.     Such efforts to lower healthcare costs by choosing to contract only for competitively priced, higher quality hospital services and not to contract for higher priced, lower quality hospital services is referred to as "selective contracting." A health plan's ability to selectively contract with hospital providers to obtain lower priced, higher quality hospital services is vital to competition.

48.     Relatedly, a health plan may create products or networks specifically designed to steer patients away from higher priced hospital providers and towards lower priced hospital providers.

49.     For example, a health plan may offer a "narrow network," which offers a more limited number of providers in exchange for lower premiums for insureds, lower allowed amounts for self-funded employers, and/or lower copays for patients.

50.     Alternatively, health plans may create "tiered" products or networks, which place hospital providers offering more competitively priced services in a preferred tier while placing less competitively priced services in a lower tier. Health plans using such tiered networks can then use financial incentives to steer patients toward providers in the preferred tiers, for example, by offering lower copays for visits to providers in the preferred tiers.

51.     Another way in which health plans can lower healthcare costs is through price transparency tools that enable patients to see, among other things, how much a hospital provider charges for certain services and what the patient's out-of-pocket expenses will be. If a health plan chooses to charge increased out of pocket charges when patients choose high priced providers, that can incentivize patients to choose more cost-effective providers.  But that only would work if health plans can provide patients with the information needed to choose more cost-effective hospital providers.

52.     Collectively using these methods (*i.e.*, selective contracting, tiered and narrow networks, price transparency tools), health plans can stimulate competition in the hospital services markets where patients would otherwise be insensitive to price. Moreover, academic research by healthcare economists has long demonstrated that these methods not only lower healthcare costs, but they do so without any corresponding reduction in quality.[16]

---

[16] *See, e.g.*, Jack Zwanziger, et al., *The Effect of Selective Contracting on Hospital Costs and Revenues*, HEALTH SERVICES RESEARCH at 849-67 (Oct. 2000), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1089156/pdf/hsresearch00012-0112.pdf (last accessed 6/13/24); Ellan M. Van Den Broek-Altenburg and Adam J. Atherly, *The relation between selective contracting and healthcare expenditures in private health insurance plans in the United States*, 124 HEALTH POLICY 174 (Feb. 2020), https://www.sciencedirect.com/science/article/abs/pii/S0168851019303021 (last accessed 6/13/24).

53.     Unfortunately, as discussed below, HHC has found a way to illegally control price and stifle competition by compelling health plans to enter into contracts that unreasonably restrain trade by blocking any and all efforts to utilize those methods through all-or-nothing contracting practices and the introduction of anti-steering, anti-tiering, and anti-transparency contract provisions. Such practices result in health plans and consumers (*i.e.*, patients) paying significantly more for inpatient and outpatient services than they otherwise would in competitive circumstances.

## VI.     MONOPOLY POWER IN THE RELEVANT MARKETS

54.     Judgment may be entered against HHC for the illegal conduct described in this complaint without defining the particular economic markets that HHC's conduct has harmed. HHC's ability to impose the All-or-Nothing and Anti-Incentive Terms (as defined herein) in all or nearly all of its agreements with insurers/network vendors and its ability to persistently charge supracompetitive prices to all its customers constitutes direct evidence of HHC's market power that obviates any need for circumstantial evidence of market power through analysis of competitive effects in particular defined markets. In addition, market definitions are unnecessary because HHC's anticompetitive conduct constitutes a *per se* violation of the Sherman Act.

55.     Notwithstanding the foregoing, the markets that are relevant to the illegal conduct described in this complaint are properly defined as follows:

A.      **The Relevant Service Markets**

1.      **General Acute Care Inpatient Hospital Services**

56.      According to Connecticut public health code, an "acute care hospital" is "a short-term hospital that has facilities, medical staff, and all necessary personnel to provide diagnosis, care and treatment of a wide range of acute conditions, including injuries." [17]

57.      General acute care inpatient hospital services ("GAC Services") are the cluster of services and ancillary products offered by an acute care hospital to patients being treated for a brief but severe episode of illness, for conditions that are the result of trauma or disease, or during surgical recovery.

58.      While this cluster comprises a broad array of services and ancillary products that are not reasonably interchangeable with one another on an individual basis—*e.g.*, a heart transplant is not a substitute for an appendectomy when a patient is admitted with appendicitis—they are properly analyzed as a single service/product market because hospitals offer them only as a cluster of services/products, and insurers/network vendors are generally required to contract for them as a cluster as opposed to contracting for them on an individual basis.

59.      Moreover, from the patients/members' perspective, they need and expect access to the full range of services and ancillary products they might reasonably need to meet all their acute healthcare needs. As such, general acute care hospitals are expected to be capable of providing all the healthcare services and products needed to treat patients requiring inpatient care.

60.      The GAC Services relevant product market is limited to the services and ancillary products that are marketed to insurance companies/network vendors for inclusion in commercial

---

[17]  Connecticut's Official State Website, *Hospitals Today: Definition and Description of Acute Care Hospitals*, https://portal.ct.gov/-/media/ohs/ohca/hospitalstudy/hosptodaypdf.pdf?la=en (last accessed 6/13/24).

health plans. It does not include those services and ancillary products offered to patients covered by government insurance programs, such as Medicare and Medicaid, whose enrollment is limited to the elderly, disabled, and underprivileged and whose prices are determined by fee schedules set by the United States Centers for Medicare & Medicaid Services ("CMS"). Thus, services and ancillary products offered by hospitals to patients covered by government insurance programs are not substitutes for the GAC Services offered by hospitals to patients covered by commercial health plans (*i.e.*, fully insured and self-insured plans).

61.    The services and ancillary products offered by facilities offering outpatient care—such as nursing homes, long-term psychiatric care facilities, rehabilitation facilities, transitional care, hospice care, and ambulatory surgery centers—also are not substitutes for GAC Services, as hospitals offering the broad array of services and ancillary products needed to effectively provide inpatient care requiring an overnight stay are not reasonably interchangeable with those services and ancillary products offered on an outpatient basis. Accordingly, price changes for services and ancillary products offered by outpatient facilities do not affect demand for GAC Services offered by hospitals.

### 2.    Outpatient Medical Services

62.    Outpatient medical services ("Outpatient Services") are the cluster of services and ancillary products offered to patients for the treatment of chronic or acute conditions which do not require overnight care. Outpatient Services are offered both by hospitals that provide inpatient care (*i.e.*, GAC Services) and by outpatient facilities that do not provide inpatient care.

63.    While this cluster comprises a broad array of services and ancillary products that are not reasonably interchangeable with one another on an individual basis—*e.g.*, chemotherapy is not a substitute for a colonoscopy—they are properly analyzed as a single service/product market because providers offer them only as a single cluster of all outpatient services and ancillary

products that they offer, and insurers/network vendors are generally required to contract for them as a cluster as opposed to contracting for them on an individual basis.

64.     The Outpatient Services relevant product market is limited to the services and ancillary products that are marketed to insurance companies/network providers for inclusion in commercial health plans. It does not include those services and ancillary products offered to patients covered by government insurance programs, such as Medicare and Medicaid, whose enrollment is limited to the elderly, disabled, and underprivileged and whose prices are determined by fee schedules set by CMS. Thus, services and ancillary products offered by Outpatient Services providers to patients covered by government insurance programs are not substitutes for the Outpatient Services offered by Outpatient Services providers to patients covered by commercial health plans (*i.e.*, fully insured and self-insured plans).

65.     GAC Services are not substitutes for Outpatient Services as the services and ancillary products are not reasonably interchangeable because the medical procedures conducted on an inpatient basis are different from those conducted on an outpatient basis. In fact, many GAC Services involve procedures where it is medically necessary for them to be performed only in a hospital on an inpatient basis instead of at an outpatient facility. Accordingly, price changes for GAC Services do not affect demand for Outpatient Services.

### B.     The Relevant Geographic Markets

66.     Although patients sometimes travel slightly farther distances for non-urgent medical care, patients generally seek GAC Services and Outpatient Services in the local areas where they live and work, which typically is where their local physicians (*i.e.*, primary care providers) have admitting privileges—*i.e.*, the ability to admit a patient to a hospital without going through an emergency department. Patients often are unwilling and, in some cases, unable to travel long distances for medical services, especially when it involves emergency or trauma care.

67.     As acknowledged by the Federal Trade Commission, "[i]n healthcare markets, distance to medical provider is one of the most important predictors of provider choice."[18]

68.     Therefore, patients do not regard hospitals located many miles away from them as substitutes for local hospitals, particularly when—as in most cases—they have little or no financial incentive to travel greater distances.

69.     Because patients are unwilling to travel great distances for GAC Services or Outpatient Services, a health plan that does not satisfy patient demand for access to conveniently located local hospitals will not be commercially viable.

70.     In fact, Connecticut law requires commercial health plans to "[m]aintain adequate arrangements to assure that such health carrier's covered persons have reasonable access to participating providers located near such covered persons' places of residence or employment." Conn. Gen. Stat. § 38a-472(e)(1)(A).

71.     There are six geographic markets at issue, each representing a distinct hospital service area or "HSA": (1) the Bridgeport HSA; (2) the Hartford HSA; (3) the Meriden HSA; (4) the Norwich HSA; (4) the Torrington HSA; and (6) the Willimantic HSA.

72.     ***The Bridgeport HSA*** covers the Greater Bridgeport Area, including at least Bridgeport, Easton, Fairfield, Milford, Monroe, Stratford and Trumbull. In the Bridgeport HSA, HHC operates St. Vincent's Medical Center (520 beds; $467 million annual operating revenue), through which HHC controls approximately 43% of the GAC Services market.

---

[18] Devesh Raval and Ted Rosenbaum, "Why is Distance Important for Hospital Choice? *Separating Home Bias from Transport Costs,"* Federal Trade Commission, at 5 (June 15, 2018), https://www.ftc.gov/system/files/documents/reports/why-distance-important-hospital-choice-separating-home-bias-transport-costs/working_paper_335_revised.pdf (last accessed 6/13/24).

73.     *The Hartford HSA* covers the Greater Hartford Area, including at least Hartford, East Hartford, Newington, Wethersfield, Bloomfield, Windsor, West Hartford, Rocky Hill, East Windsor, South Windsor, Enfield, Manchester, Berlin, Bristol, New Britain, Newington, Plainville, Southington, and Wolcott. In the Hartford HSA, HHC operates Hartford Hospital (867 beds; $2 billion annual operating revenue) and the Hospital of Central Connecticut (446 beds; $553 million in annual operating revenue), through which HHC controls approximately 55% of the GAC Services market. According to HHC's primary competitor in the Hartford HSA, St. Francis Hospital and Medical Center, HHC controls 50-80% of specialist outpatient physicians depending on the specialty in question.

74.     *The Meriden HSA* covers the Greater Meriden Area, including at least Meriden, Cheshire, Southington, and Wallingford. In the Meriden HSA, HHC operates the only hospital, MidState Medical Center (156 beds; $385 million annual operating revenue), through which HHC controls approximately 66% of the GAC Services market.

75.     *The Norwich HSA* covers the Greater Norwich Area, including at least Norwich, Bozrah, Franklin, Griswold, Ledyard, Montville, Plainfield, Preston, Sprague, and Lisbon. In the Norwich HSA, HHC operates the only hospital, Backus Hospital (233 beds; $450 million annual operating revenue), through which HHC controls approximately 84% of the GAC Services market and approximately 70% of the Outpatient Services market. With respect to Outpatient Services, HHC controls all the providers of certain outpatient specialties, including 100% of urologists and 100% of pulmonologists accessible through a commercial health plan in the Norwich HSA.

76.     *The Torrington HSA* covers the Greater Torrington Area, including at least Torrington, Barkhamsted, Canaan, Canton, Colebrook, Goshen, Harwinton, Litchfield, Morris, New Hartford, Norfolk, North Canaan, Thomaston, and Winchester. In the Torrington HSA, HHC

operates the only hospital, Charlotte Hungerford Hospital (122 beds; $175 million annual operating revenue), through which HHC controls approximately 79% of the GAC services market and approximately 75% of the Outpatient Services market. With respect to Outpatient Services, HHC controls all the providers of certain outpatient specialties, including 100% of urologists, 100% of pulmonologists, and 10)% of cardiologists accessible through a commercial health plan in the Torrington HSA.

77.    ***The Willimantic HSA*** covers the Greater Willimantic Area, including at least Willimantic, Chaplin, Columbia, Coventry, Hampton, Lebanon, Mansfield, Scotland, and Windham. In the Willimantic HSA, HHC operates the only hospital, Windham Hospital (130 beds; $128 million annual operating revenue), through which HHC controls approximately 80% of the GAC services market and approximately 75% of the Outpatient Services market. With respect to Outpatient Services, HHC controls all the providers of certain outpatient specialties, including 100% of urologists and 100% of pulmonologists accessible through a commercial health plan in the Willimantic HSA.

### C.    HHC Controls a Dominant Share of the Relevant Markets

78.    As referenced above, HHC has a dominant market share in the GAC Services markets in the Meriden, Norwich, Torrington, and Willimantic HSAs with approximately 66%, 84%, 79%, and 80% market share, respectively. HHC also holds significant market share in the GAC Services markets in the Bridgeport and Hartford HSAs of approximately 43% and 50%, respectively. With respect to Outpatient Services, upon information and belief, HHC's market shares are somewhere between 50% and 80% market share in each of the geographic markets.

79.    In each of the Meriden, Norwich, Torrington, and Willimantic HSAs, HHC operates the only hospital that provides GAC Services. As such, those hospitals—MidState

Medical Center, Backus Hospital, Charlotte Hungerford Hospital, and Windham Hospital, respectively—are "must have" hospitals.

80.     If a commercial health plan wants to offer a viable product that it can market to either insureds or self-insured plans in or near those regions in Connecticut, it has no choice but to include those "must have" hospitals in its network irrespective of the price or quality of the GAC Services they offer.

81.     In addition, HHC has leveraged and continues to leverage the market power it has in those markets to increase its dominance and pricing in the Outpatient Services markets in those same geographic areas, as well as in both the GAC and Outpatient Services markets in the Bridgeport and Hartford HSAs. This is accomplished using the All-or-Nothing and Anti-Incentive Terms alleged herein.

82.     HHC's use of anticompetitive referral and contracting practices to successfully shift volume away from other hospital and outpatient providers in the relevant markets and increase HHC's own market share also has directly enhanced HHC's bargaining power in its negotiations with insurers/network providers. It is well established in the healthcare academic literature that in such negotiations, the critical factor for an insurer/network vendor is its "Best Alternative to a Negotiated Agreement" or "BATNA." Thus, the less attractive the alternatives to a negotiated agreement with HHC become, the more likely the insurer/network vendor is to capitulate to and accept HHC's demands (and the accompanying supracompetitive prices) because the alternatives would be even worse.

83.     HHC's ability to demand and enforce these anticompetitive contract terms, as well as its ability to charge supracompetitive prices, demonstrates its market power in each of the relevant markets. In other words, HHC's significant, non-transitory increases in price above

competitive price levels generally have not caused its hospitals to be excluded from commercial health plans and have not caused HHC's hospitals to lose enough patients to make the price increases unprofitable. Indeed, for many years, each of HHC's hospitals has profitably imposed and sustained supracompetitive prices for both GAC and Outpatient Services that are substantially higher than competitive price levels.

84.     HHC's ability to charge substantially higher prices than its competitors for the same services and ancillary products cannot be explained by legitimate market factors such as convenience or quality. In fact, HHC's competitors—most notably, Yale New Haven Health—have reputations for high quality and good healthcare outcomes that generally equal or exceed those of HHC's hospitals within the same geographic markets. Nevertheless, HHC has unlawfully obtained, maintained, or enhanced the power to impose substantially higher prices for its GAC and Outpatient Services.

**D.     There are Significant Barriers to Entry into the Relevant Markets**

85.     Building and staffing hospitals and outpatient facilities is expensive. Not only does it require substantial capital investments in facilities and equipment, it also requires the hiring of skilled staff members that are historically in low supply.

86.     Moreover, healthcare generally—and GAC and Outpatient Services in particular—is highly regulated. Opening or expanding facilities would involve regulatory hurdles, including obtaining certificates of need from Connecticut.

87.     However, it is HHC's own illegal conduct that presents the most effective barrier to entry. Because HHC uses its market power to impose All-or-Nothing and Anti-Incentive Terms in each of its contracts with commercial health plans that effectively block any efforts to stimulate price competition, it has become virtually impossible for HHC's more cost-effective rivals to compete by offering lower prices.

## VII.    ANTICOMPETITIVE CONDUCT

### A.    HHC's Anticompetitive Contracting Practices

88.    Beginning no later than June 2020 and continuing until the present, HHC has engaged in anticompetitive contracting practices when negotiating with health plans for hospital services.[19] In particular, HHC has required all health plans with whom it negotiates to contract for hospital services on an "all or nothing" basis, meaning all of HHC's hospitals and all of their services, both GAC and Outpatient Services, must be included in the network or none of them will be ("All-or-Nothing Terms").

89.    In addition, HHC insists on the inclusion of anti-steering, anti-tiering, and anti-transparency provisions (collectively, the "Anti-Incentive Terms") in those contracts that prevent health plans from, among other things, creating narrow/tiered networks or using transparency tools that would otherwise create incentives designed to steer members away from more expensive hospital service providers like HHC and towards more efficient, lower-priced competitors.

90.    HHC owns and operates several "must have" hospitals throughout Connecticut: Windham Hospital in the Willimantic HSA; Backus Hospital in the Norwich HSA; Charlotte Hungerford Hospital in the Torrington HSA; and MidState Medical Center in the Meriden HSA. If a health plan wishes to offer a product that covers insureds or employees in any of these geographic areas, it must include all HHC hospital facilities and services in its network. Due to HHC's control over the "must have" hospitals referenced above, health plans have no choice but to capitulate to HHC's demands and agree to HHC's All-or-Nothing and Anti-Incentive Terms.

---

[19] *See When Hospitals Merge to Save Money, Patients Often Pay More*, N.Y. TIMES (Nov. 14, 2018), www.nytimes.com/2018/11/14/health/hospital-mergers-health-care-spending.html (last accessed 6/13/24) (stating HHC "negotiate[s] prices as a single entity, forcing health insurers to include all of their hospitals in a network or risk losing access in areas where there are no alternatives.").

91.     For example, if a health plan wanted to offer a product with a provider network that covered both the Bridgeport and Norwich HSAs, it would have no choice but to include HHC's Backus Hospital, as that is the only hospital in the Norwich HSA. But in the Bridgeport HSA, absent HHC's anticompetitive conduct, that health plan could elect to include only Yale New Haven Health's Bridgeport Hospital, which offers lower prices and higher quality than HHC's St. Vincent's Medical Center. However, because of HHC's All-or-Nothing Terms, the health plan would have no choice but to include HHC's St. Vincent's Medical Center in its network, otherwise HHC would withhold including its Backus Hospital in the health plan's network. Moreover, assuming the health plan decided to include both Yale New Haven Health's Bridgeport Hospital and HHC's St. Vincent Medical Center in the same network, because of HHC's Anti-Incentive Terms, the health plan would also be prohibited from creating a tiered product that would steer members towards Bridgeport Hospital, with its more efficient and lower-priced healthcare, and away from St. Vincent's Medical Center.

92.     In another example, a health plan wishing to offer a product covering the Torrington HSA might want to include inpatient hospital services at HHC's Charlotte Hungerford Hospital (as that is the only hospital in that geographic area) but not to include HHC's outpatient services in the Torrington HAS, as other providers—such as Yale New Haven Health's Smilow Cancer Hospital satellite location in Torrington—offer outpatient services at lower prices and/or higher quality than HHC's Outpatient Services facilities. However, due to HHC's All-of-Nothing Terms, the health plan would be prevented from excluding HHC's Outpatient Services from the network and, due to HHC's Anti-Incentive Terms, would also be prevented from creating a tiered network to steer insureds away from HHC's Outpatient Services facilities by placing them in a less preferred tier.

93.     As a result, the major managed care health plans operating in Connecticut—Aetna, Cigna, United, and Anthem—do not offer tiered networks in Connecticut, despite offering them in many other geographic regions across the country.

94.     As these examples demonstrate, HHC's All-or-Nothing and Anti-Incentive Terms prevent health plans from creating provider networks that steer members away from HHC's higher-cost, lower quality hospital services and towards lower cost, high-quality hospital service providers in geographic markets where there are competitors that would otherwise force HHC to compete on the merits. Absent these anticompetitive practices, HHC would have to choose between lowering its prices to meet the competition of its more efficient rivals or lose business to its competitors. But because of these anticompetitive practices, HHC has been able to successfully immunize itself from competition, thereby preventing the creation of lower-cost provider networks throughout Connecticut.

95.     Thus, HHC's All-or-Nothing and Anti-Incentive Terms are designed to suppress competition in the Relevant Markets and increase the prices HHC can charge health plans for hospital services, thus having the following anticompetitive purposes and effects:

(a)     Enabling HHC to charge supracompetitive prices for lower quality hospital services substantially beyond what would be tolerated in a competitive market;

(b)     Suppressing competition and protecting HHC's market power in the Relevant Markets;

(c)     Limiting the introduction of innovative health plan products, such as narrow networks and tiered plans, designed to lower healthcare costs and improve quality of healthcare;

(d)     Reducing health plans' ability to incentivize patients to choose more cost-effective hospital service providers; and

(e)     Depriving patients of the benefits of a competitive market for their purchases of hospital services.

96.     As a result, HHC's anticompetitive contracting practices unreasonably and unlawfully restrain trade by insulating HHC from competitive forces that would otherwise discipline pricing in an unrestrained market, causing Plaintiffs and the proposed Class to pay artificially inflated prices for hospital services.

**B.    ICP's Restraint of Competition for Outpatient Services**

97.     HHC also restrains price competition in the Outpatient Services market through ICP, a wholly owned subsidiary of HHC that is a network of purportedly independent physicians who provide Outpatient Services throughout the Relevant Geographic Markets.

98.     The solo and group physician practices that join ICP, though technically independent, are controlled by HHC and do not compete against HHC. But for the conduct alleged herein, these physician practices would be a critical form of price competition in the Outpatient Services market and would compete against ICP for inclusion in payer networks as Outpatient Services providers.

99.     HHC coerces solo and group physician practices into joining ICP in various ways, including by withholding HHC referrals from physicians who do not join ICP. Because HHC's facilities are so dominant, independent physician practices cannot practicably afford to lose such a significant source of referrals, so they join ICP by necessity. ICP also entices independent physicians to join by offering them higher payer reimbursement rates—*i.e.*, sharing the profits obtained by HHC through its supracompetitive pricing and monopoly power—and by offering access to certain critical technology, such as HHC's electronic healthcare records system and HHC's exclusive ability to use certain advanced surgical technology.

100.    Once these ostensibly independent physician practices join ICP, HHC negotiates reimbursement prices with health plans on behalf of all ICP members. Thus, these technically independent physician practices delegate their pricing authority to HHC, their main competition.

Furthermore HHC prevents ICP members from entering into contracts with payers separately from the contractual rates negotiated by ICP, and HHC threatens to remove from ICP any physicians who negotiate separately with health plans or who do business with HHC's competitors. As a result, these purportedly independent physician practices are *de facto* controlled by HHC, are not available for health plans to assemble provider networks that do not include HHC-controlled Outpatient Services providers that could compete against HHC's providers, and cannot provide price competition to HHC's dominance over the Outpatient Services market.

101.    The prices that HHC negotiates are higher than the prices that the ICP-affiliated physicians could negotiate on their own, in part due to the market power that HHC already possesses in addition to the market power that HHC gains through the commitment of these ICP-affiliated physicians. These supracompetitive reimbursement rates provide the monopoly profits that HHC can share with the independent physicians who commit not to competing against HHC on price at the payer contracting level.

102.    This is textbook price fixing. HHC and the purportedly independent physicians who join ICP, which are horizontal competitors, agree not to compete on price and to allow HHC to negotiate with health plans on behalf of the entire group of competitors. HHC monitors compliance with this horizontal cartel and punishes any physician practices that break from the group to compete against HHC in the marketplace. The result is that payers and their insured members pay inflated prices.

103.    Further, physician practices that join ICP are locked into exclusive contracts with ICP that prevent those physicians from joining competing clinical networks—for example, the network run through Saint Francis—and are not available to join a network that might be assembled by a payer outside of HHC's and ICP's network offerings to payers. ICP-affiliated

practices that work with competing healthcare providers, like Saint Francis, are threatened by HHC, including with the loss of access to HHC's critical network of referrals and the loss of admitting privileges at HHC facilities, and will otherwise be injured in their business. In addition, ICP-affiliated providers who try to enter contracts outside of the ICP network are threatened with expulsion from ICP and loss of, among other things, the favorable reimbursement rates that ICP is able to negotiate on their behalf due to HHC's market power.

104.    Similarly, HHMG's contracts with its physicians contain a clause expressly prohibiting them from referring patients outside of the HHC system:

> As an employee of [HHMG], all patient referrals made by you within your scope of employment must be made to providers and entities within Hartford HealthCare, unless (a) the patient expresses a preference for a different provider or entity; (b) the patient's insurer determines the provider or entity; or (c) the referral is not in the patient's best medical interests in your reasonable judgment.

105.    Between HHMG, a collection of over 800 HHC-employed physicians, and ICP, HHC controls a majority of physician practices that provide Outpatient Services in numerous areas within the Relevant Geographic Markets. Without access to the ICP practices to assemble networks that can compete against HHC, HHC is able to foreclose at least 40% of the Outpatient Services market from competing healthcare providers. At the same time, this also prevents payers assembling lower-cost provider networks.

106.    By substantially foreclosing the market for Outpatient Services, HHC has been able to prevent payers and competing providers from assembling competing networks. This has prevented price competition and enabled HHC, including ICP and its affiliated physicians, to charge supracompetitive prices for Outpatient Services.

## VIII.   DEFENDANTS' ANTICOMPETITIVE CONDUCT HAS INJURED PLAINTIFFS AND THE CLASS

107.    Both insurance companies and self-funded payers must obtain access to healthcare provider networks at specific, negotiated prices in order to offer a commercially viable health plan. Hence, it is the agreements between HHC and insurers/network vendors that determine the amounts that will be paid both by insurance companies and self-funded payors when their health plan enrollees utilize an HHC hospital or outpatient facility for medical care.

108.    The All-or-Nothing and Anti-Incentive Terms contained in the agreements between HHC and insurers/network vendors are components of an overarching scheme that unreasonably restrain trade and prevent salutary price competition that is the hallmark of our free-market economic system. By contractually insulating itself from the price discipline that flows from unconstrained price competition, HHC can charge and maintain prices for its GAC and Outpatient Services that dramatically exceed those that it could charge in an unrestrained competitive market.

109.    In the Bridgeport and Hartford HSAs, HHC faces competition in the GAC Services market from other hospitals. Despite this competition, HHC manages to charge supracompetitive prices while offering lower quality of care than nearby competitors who are less expensive.

110.    In the Hartford HSA, HHC faces competition from St. Francis Hospital. Despite offering a lower quality of care, HHC's Hartford Hospital charges significantly higher prices than St. Francis Hospital. In fact, Hartford Hospital's rates are more than 15% higher than those of St. Francis and other area hospitals, even though St. Francis Hospital ranked higher than Hartford Hospital in 33 of the 52 quality of care measures tracked by CMS:

| Quality Metric | Hartford Hospital (HHC) | St. Francis Hospital (Competitor) |
|---|---|---|
| Rate of Readmission After Discharge From Hospital | 14.9% | 14.8% |
| Ratio of Unplanned Hospital Visits After Hospital Surgery | 1.0 | 0.8 |

| | | |
|---|---|---|
| Average Time Patients Spent in E.R. | 283 minutes | 256 minutes |
| Death Rate for Heart Attack Patients | 11.8% | 11.7% |
| Death Rate for Stroke Patients | 14.1% | 17% |
| Death Rate for Pneumonia Patients | 18.4% | 18.1% |
| Rate of Complications for Hip/Knee Replacements | 2.6% | 2.7% |
| **Source**: CMS Medicare Comparison Tool (https://www.medicare.gov/care-compare/) | | |

111.   According to data collected by the RAND Corporation, the GAC prices paid by private employer-sponsored health plans between 2020 and 2022 for both inpatient and outpatient services were higher at Hartford Hospital than at St. Francis.

| | **Standardized Price Per Outpatient Service** | **Standardized Price Per Inpatient Stay** | **Standardized Facility Price Per Inpatient Stay** |
|---|---|---|---|
| **Hartford Hospital (HHC)** | $325.76 | $27,339.00 | $25,505.00 |
| **St. Francis Hospital (Competitor)** | $285.91 | $22,986.00 | $21,057.00 |

112.   Furthermore, when comparing individual "generally homogenous" procedures—*i.e.*, those that are conducted frequently and for which there is little to no variation in quality—HHC charges substantially more than its Hartford HSA competitors. For example, HHC's Hartford Hospital charges $2,200 for a colonoscopy while its nearby competitor, St. Francis Hospital, charges only $1,800. Hartford Hospital similarly charges roughly four times as much as St. Francis for blood transfusions.

113.   The price of a Level 1 ER visit at Hartford Hospital is over 50% higher than at St. Francis Hospital, and a Level 5 ER visit is more than three times as expensive and results in nearly a $3,000 overcharge by HHC relative to St. Francis.



114.    The poor quality and high prices at HHC's Hartford Hospital led one independent analysis from 2017 to conclude that Hartford Hospital provided "a general lack of value for patients getting care at that facility" especially "given its low quality scores."

115.    In the Bridgeport HSA, HHC's St. Vincent's Medical Center faces competition from Yale New Haven Health's Bridgeport Hospital, which is a mere three miles away. But once again, HHC charges higher prices than its competitor that cannot be justified by differences in quality.

| Quality Metric | St. Vincent's Medical Center (HHC) | Bridgeport Hospital (Competitor) |
|---|---|---|
| Rate of Readmission After Discharge From Hospital | 14.6% | 15.4% |
| Ratio of Unplanned Hospital Visits After Hospital Surgery | 1.2 | 0.7 |
| Average Time Patients Spent in E.R. | 195 minutes | 137 minutes |
| Death Rate for Heart Attack Patients | 12.2% | 11.4% |
| Death Rate for Stroke Patients | 15.4% | 11.8% |
| Death Rate for Pneumonia Patients | 19.5% | 14.7% |
| Rate of Complications for Hip/Knee Replacements | 4.5% | 3% |

**Source**: CMS Medicare Comparison Tool (https://www.medicare.gov/care-compare/)

116.     The GAC prices paid by private employer-sponsored health plans between 2020 and 2022 for outpatient services were higher at HHC's St. Vincent's Medical Center than at competitor Bridgeport Hospital.

|  | **Standardized Price Per Outpatient Service** |
|---|---|
| **St. Vincent's Medical Center (HHC)** | $324.63 |
| **Bridgeport Hospital (Competitor)** | $260.99 |

117.     The "Total Facility Price" for St. Vincent's Medical Center was calculated to be 238% of Medicare while Bridgeport Hospital was calculated as 232% of Medicare. To assist commercial payors in identifying opportunities for price negotiations, RAND further calculated the breakeven price for both facilities to be 131% of Medicare.



118.     Furthermore, when comparing individual "generally homogenous" procedures, HHC charges substantially more than its Bridgeport HSA competitor. For example, a colonoscopy at HHC's St. Vincent's Medical Center costs $3,800 while Bridgeport Hospital charges only

$1,400. Similarly, the price of a Level 1 ER visit and a Level 5 ER visit is 150% higher and 250% higher, respectively at St. Vincent's Medical Center compared to Bridgeport Hospital.

119.    In another example, the price of a laser cataract removal—a generally homogenous and non-urgent, shoppable procedure—is $2,724 at HHC's St. Vincent's Medical Center while Bridgeport Hospital charges only $795 for the same procedure.

120.    And with respect to Outpatient Services, throughout Connecticut HHC's prices for outpatient procedures are higher than the market average for all providers.

| | HHC Hospitals | Statewide |
|---|---|---|
| **Standardized Price Per Outpatient Service (2022)** | $357.52 | $340.90 |

| Standardized Price by Service | Hartford Hospital (HHC) | St. Francis Hospital (Competitor) | % Δ | St. Vincent's Medical Center (HHC) | Bridgeport Hospital (Competitor) | % Δ |
|---|---|---|---|---|---|---|
| Outpatient (All Services) | $325.76 | $285.91 | +14% | $324.63 | $260.99 | +24% |
| Endoscopy | $411.57 | $318.96 | +29% | $368.23 | $270.62 | +36% |
| Laparoscopic Surgery | $235.15 | $182.13 | +29% | $228.92 | $198.23 | +15% |
| ER Visit | $663.60 | $593.12 | +12% | $470.64 | $301.00 | +56% |

121.    As a result, private-employer-sponsored health plans in Connecticut, on average, spent $1.4 billion on inpatient and outpatient services in 2022—the seventh highest in the nation. This amount was approximately $861 million, or 158%, more than what the same services would have cost using Medicare allowed amounts.

122.    HHC's All-or-Nothing and Anti-Incentive Terms thus have caused antitrust injury to Plaintiffs and the proposed Class in their business or property by artificially inflating prices they

have paid for GAC Services and/or Outpatient Services directly to HHC in the relevant geographic markets. The alleged unlawful conduct, and Plaintiffs' injuries, are continuing through the present.

123.    For these reasons, Plaintiffs' injuries and those of the proposed Class are of the type that the antitrust laws were intended to prevent and flow from HHC's conduct, which violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

## IX.   CLASS ALLEGATIONS

### A.    Class Definition

124.    Plaintiffs bring this action on behalf of themselves and as representatives of a Class of similarly situated entities defined as follows:

> All insurers and health plans that paid or reimbursed for GAC Services and/or Outpatient Services in the Bridgeport, Hartford, Meriden, Norwich, Torrington, and Willimantic HSAs directly from one or more Defendants at any time during the period from June 14, 2020 up to the time the alleged ongoing anticompetitive conduct has ceased (the "Class Period"). The Class excludes all federal government entities.

125.    This class definition is subject to revision or amendment as the matter proceeds.

### B.    Class Certification Requirements

126.    This action is suitable for resolution on a class-wide basis under the requirements of Federal Rule of Civil Procedure 23.

127.    <u>Numerosity</u>: The Class is composed of at least hundreds of members, the joinder of whom in one action is impracticable. The Class is ascertainable and identifiable from, inter alia, Defendants' records and documents.

128.    <u>Commonality</u>: Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common issues include, but are not limited to:

1.      Whether Defendants have monopoly power demonstrated either through direct or indirect evidence;

2.      The definition of the relevant services and geographic markets;

3.      Whether Defendants engaged in anticompetitive conduct by willfully or otherwise unlawfully maintaining or enhancing their monopoly power or attempting to do so through the unlawful conduct alleged herein;

4.      Whether Defendants' abuse of their monopoly power has substantially foreclosed competition in the Relevant Markets;

5.      Whether Defendants' unlawful conduct alleged herein, or any part thereof, is an unlawful restraint of trade;

6.      Whether the unlawful conduct alleged herein has artificially inflated prices, reduced output, and/or reduced quality in any or all of the Relevant Markets;

7.      Whether Plaintiffs and the proposed Class have suffered injury caused by the alleged anticompetitive conduct; and

8.      Whether and to what extent Plaintiffs and the proposed Class members are entitled to an award of compensatory damages and/or injunctive, declaratory, or equitable relief.

129.    Typicality: Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs and the other Class members have been injured by the same wrongful practices. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

130.    Adequate Representation: Plaintiffs will fully and adequately assert and protect the interests of the other Class members. Plaintiffs have retained class counsel who are experienced and qualified in prosecuting class action cases. Neither Plaintiffs nor their attorneys have any interests conflicting with Class members' interests.

131.    Predominance and Superiority: This class action is appropriate for certification because questions of law and/or fact common to the members of the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all

members of the Class is impracticable. Should individuals be required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent ruling and contradictory judgments. This class action presents fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

132.     <u>Injunctive Relief</u>: The prosecution of the claims of the Class in part for injunctive relief, declaratory, or equitable relief, is appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## X.     INTERSTATE TRADE & COMMERCE

133.     The conduct of Defendants has been within the flow of and substantially affected interstate commerce.

134.     During the relevant period, a large percentage of HHC's revenues have come from sources located outside of Connecticut, including the federal government (through the Medicare and Medicaid programs).

135.     HHC purchases a substantial portion of its medicines and supplies from sellers located outside of Connecticut. Many payers have made payments to HHC (either directly or through health plans) to sell or buy products or services in interstate commerce.

**CAUSES OF ACTION**

**Count One: Monopolization**
**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**

136.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

137.    HHC has monopolized, and continues to monopolize, the GAC Services markets in the Meriden, Norwich, Torrington, and Willimantic HSAs. HHC has monopoly power, including the ability to control prices and exclude competition, in those markets.

138.    HHC willfully and intentionally engaged in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining and extending its monopolies in the above markets.

139.    This predatory, exclusionary, and anticompetitive conduct, which has unreasonably restrained and threatens to continue unreasonably restraining competition in the above markets, includes at least the following:

(a)    HHC's refusal to contract with insurers/network vendors on anything other than an All-or-Nothing basis;

(b)    HHC's forced imposition of Anti-Incentive Terms on all insurers/network vendors with whom it contracts in Connecticut;

(c)    Defendants' Anticompetitive Referral Policies;

(d)    Defendants' use of Exclusive Dealing Contracts which prevent ICP members from joining other networks or negotiating separately with health plans; and

(e)    Defendants' use of Exclusive Dealing Contracts which require all ICP members to delegate pricing authority to HHC, thus resulting in a price-fixing conspiracy amongst horizontal competitors.

140.    HHC's anticompetitive and monopolistic conduct have had the direct effect of inhibiting competition from both existing and would-be competitors who would have competed with HHC on price and quality. It further enabled HHC to leverage its monopoly power in the GAC Services markets in the Meriden, Norwich, Torrington, and Willimantic HSAs to extra supracompetitive prices in the other relevant markets in which it operates—*i.e.*, the Outpatient Services markets in the Meriden, Norwich, Torrington, and Willimantic HSAs, as well as both the GAC Services and Outpatient Services markets in the Bridgeport and Hartford HSAs.

141.    As a direct and proximate result of HHC's anticompetitive and monopolistic conduct, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for GAC and Outpatient Services in each of the HSAs discussed above.

142.    Thus, Plaintiffs and the proposed Class have been injured in their business or property during the Class Period in violation of the Sherman Act, having paid supracompetitive prices for GAC and Outpatient Services. Such overcharges are the type of injury that the antitrust laws were designed to prevent, and they were the direct result of HHC's anticompetitive and monopolistic conduct.

143.    Wherefore, Plaintiffs and the proposed Class are entitled to monetary damages, including treble damages, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

### Count Two: Attempted Monopolization
### (Section 2 of the Sherman Act, 15 U.S.C. § 2)

144.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

145.    During the Class Period, HHC engaged in and continues to engage in the willful and unlawful attempt to maintain or expand its monopoly power.

146.    More specifically, HHC has attempted to leverage its monopoly power in the GAC Services markets in the Meriden, Norwich, Torrington, and Willimantic HSAs through the use of its Anticompetitive Referral Policies and All-or-Nothing and Anti-Incentive Terms to enhance its market power and monopolize the GAC Services markets in the Bridgeport and Hartford HSAs, as well as the Outpatient Services markets in the Bridgeport, Hartford, Meriden, Norwich, Torrington, and Willimantic HSAs.

147.    There is a dangerous probability that HHC will be successful in its attempt to monopolize those markets.

148.    As a direct and proximate result of HHC's attempts to monopolize the above markets, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for GAC and Outpatient Services in each of the HSAs discussed above.

149.    Thus, Plaintiffs and the proposed Class have been injured in their business or property during the Class Period in violation of the Sherman Act, having paid supracompetitive prices for GAC and Outpatient Services. Such overcharges are the type of injury that the antitrust laws were designed to prevent, and they were the direct result of HHC's anticompetitive and monopolistic conduct.

150.    Wherefore, Plaintiffs and the proposed Class are entitled to monetary damages, including treble damages, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

### Count Three: Unreasonable Restraint of Trade
### (Section 1 of the Sherman Act, 15 U.S.C. § 1)

151.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

152.    HHC entered into and continues to enter into anticompetitive contracts with insurers (acting on behalf of the insurer's own health plans or as a network vendor assembling provider networks to market to self-insured health plans) containing anticompetitive contract provisions (*i.e.*, the All-or-Nothing and Anti-Incentive Terms) which unreasonably restrain trade.

153.    These anticompetitive contract provisions eliminate the key methods used by insurers/network vendors to promote price competition in the Relevant Markets—namely, through

selective contracting and the use of narrow networks, tiering, and price transparency tools to steer patient members to providers offering GAC and Outpatient Services, of the same or better quality, at lower prices.

154.     Therefore, these anticompetitive contract provisions constitute vertical restraints which have been imposed upon all or nearly all insurers/network vendors in Connecticut and, thus, have substantially foreclosed competition in the Relevant Markets.

155.     The anticompetitive effects of HHC's scheme far outweigh any purported non-pretextual, procompetitive justifications.

156.     As a direct and proximate result of HHC's anticompetitive scheme, Plaintiffs and the proposed Class have paid artificially inflated prices for GAC and Outpatient Services performed for the benefit of their health plan members that were higher than they would have been absent HHC's anticompetitive scheme.

157.     Thus, Plaintiffs and the proposed Class have been injured in their business or property during the Class Period in violation of the Sherman Act, having paid supracompetitive prices for GAC and Outpatient Services. Such overcharges are the type of injury that the antitrust laws were designed to prevent, and they were the direct result of HHC's anticompetitive scheme.

158.     Wherefore, Plaintiffs and the proposed Class are entitled to monetary damages, including treble damages, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

### Count Four: Tying
### (Section 1 of the Sherman Act, 15 U.S.C. § 1)

159.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

160.    During the Class Period, HHC has engaged in unlawful tying by conditioning the inclusion of GAC Services at its "must have" hospitals in the Meriden, Norwich, Torrington, and Willimantic HSAs on the inclusion of its Outpatient Services at those and other facilities in the Meriden, Norwich, Torrington, and Willimantic HSAs, as well as the inclusion of both its GAC Services and Outpatient Services at its facilities in the Bridgeport and Hartford HSAs.

161.    HHC has substantial market power with respect to its "must have" hospitals.

162.    GAC Services and Outpatient Services represent two separate and distinct bundles of services that insurers/network vendors would negotiate for and/or decide whether to purchase separately.

163.    Insurers/network vendors would prefer to include GAC and Outpatient Services offered by other hospital providers offering lower prices for similar or better quality of care, but they are prevented from doing so because of HHC's Anticompetitive Referral Policies and All-or-Nothing and Anti-Incentive Terms.

164.    HHC's unlawful tying scheme has eliminated the key methods used by insurers/network vendors to promote price competition in the Relevant Markets—namely, through selective contracting and the use of narrow networks, tiering, and price transparency tools to steer patient members to providers offering GAC and Outpatient Services, of the same or better quality, at lower prices.

165.    HHC's unlawful tying scheme has been imposed upon all or nearly all insurers/network vendors in Connecticut and, thus, has substantially foreclosed competition in the above markets.

166.    HHC's unlawful tying scheme has affected a substantial amount of interstate commerce, and HHC has a substantial economic interest in the sale of GAC and Outpatient

Services in the above relevant markets. As such, HHC's unlawful tying scheme is a *per se* violation of the antitrust laws.

167.    Alternatively, HHC's unlawful tying scheme is unlawful under the Rule of Reason because it unreasonably restrains trade and is not outweighed by any procompetitive benefits, as there are no non-pretextual, procompetitive business justifications for HHC's unlawful tying arrangements.

168.    As a direct and proximate result of HHC's unlawful tying scheme, Plaintiffs and the proposed Class have paid artificially inflated prices for GAC and Outpatient Services performed for the benefit of their health plan members that were higher than they would have been absent HHC's anticompetitive scheme.

169.    Thus, Plaintiffs and the proposed Class have been injured in their business or property during the Class Period in violation of the Sherman Act, having paid supracompetitive prices for GAC and Outpatient Services. Such overcharges are the type of injury that the antitrust laws were designed to prevent, and they were the direct result of HHC's unlawful tying scheme.

170.    Wherefore, Plaintiffs and the proposed Class are entitled to monetary damages, including treble damages, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

### Count Five: Exclusive Dealing
### (Section 1 of the Sherman Act, 15 U.S.C. § 1)

171.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

172.    During the Class Period, HHC has restrained price competition in the Outpatient Services markets by coercing solo and group physician practices into joining ICP, including by withholding or threatening to withhold HHC referrals from physician practices that do not join

ICP; by offering higher payer reimbursement rates (*i.e.*, sharing the monopoly profits obtained by HHC through its supracompetitive pricing and market power); and by offering access to critical technology, such as HHC's healthcare records system and HHC's exclusive ability to use certain advanced surgical technology.

173.    HHC then negotiates reimbursement rates with health plans on behalf of all ICP members, who delegate pricing authority to HHC. HHC prevents ICP members from joining other networks or negotiating separately with health plans.

174.    As a result, these ICP members are *de facto* controlled by HHC and are not available for health plans to assemble provider networks that do not include HHC-controlled Outpatient Services providers that could compete against HHC's providers, substantially foreclosing competition for Outpatient Services in each of the relevant geographic markets.

175.    The prices that HHC negotiates on behalf of ICP members are higher than prices those physicians could negotiate on their own.

176.    As a direct and proximate result of these exclusive dealing contracts, Plaintiffs and the proposed Class have paid artificially inflated prices for GAC and Outpatient Services performed for the benefit of their health plan members that were higher than they would have been absent HHC's anticompetitive conduct.

177.    Thus, Plaintiffs and the proposed Class have been injured in their business or property during the Class Period in violation of the Sherman Act, having paid supracompetitive prices for GAC and Outpatient Services. Such overcharges are the type of injury that the antitrust laws were designed to prevent, and they were the direct result of the exclusive dealing contracts at issue.

178.    Wherefore, Plaintiffs and the proposed Class are entitled to monetary damages, including treble damages, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

**Count Six: Price Fixing**
**(Section 1 of the Sherman Act, 15 U.S.C. § 1)**

179.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

180.    During the Class Period, HHC and the ICP Providers had a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, and stabilize prices for Outpatient Services in the relevant geographic markets.

181.    But for the conduct alleged herein, HHC and the ICP Providers would be horizontal competitors in the Outpatient Services markets in the relevant geographic markets.

182.    HHC has successfully coerced otherwise independent physicians into joining ICP and delegating their pricing authority to HHC.

183.    As a result, this combination and conspiracy has had the following effects, among others:

(a)    Price competition in the Outpatient Services markets have been restrained, suppressed, and/or eliminated in each of the relevant geographic markets;

(b)    Prices for Outpatient Services have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels in each of the relevant geographic markets; and

(c)    Plaintiffs and the proposed Class, who have paid for Outpatient Services in the Relevant Geographic Markets, have been deprived of the benefits of free and open competition and have paid artificially high prices for Outpatient Services.

184.    Thus, Plaintiffs and the proposed Class have been injured in their business or property during the Class Period in violation of the Sherman Act, having paid supracompetitive prices for Outpatient Services. Such overcharges are the type of injury that the antitrust laws were

designed to prevent, and they were the direct result of the combination and conspiracy alleged herein.

185.    Wherefore, Plaintiffs and the proposed Class are entitled to monetary damages, including treble damages, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

## JURY DEMAND

186.    Plaintiffs demand a jury trial on all claims and issues that are so triable.

## PRAYER FOR RELIEF

187.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court:

1.    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

2.    Find that Defendants have monopolized, and continue to monopolize, the Relevant Markets alleged herein in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Plaintiffs and the members of the Class have been damaged and injured in their business and property as a result of this violation;

3.    Find that Defendants have unlawfully restrained trade in the Relevant Markets alleged herein in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the members of the Class have been damaged and injured in their business and property as a result of this violation;

4.    Award Plaintiffs and the members of the Class threefold the damages determined to have been sustained by them as a result of Defendants' misconduct complained of herein, as

required by statute, 15 U.S.C. § 15, and that judgment be entered against Defendants for the amount so determined;

5.      Award Plaintiffs and the members of the Class reasonable attorneys' fees, costs, and expenses incurred in pursuing this action;

6.      Award Plaintiffs and the members of the Class pre-judgment and post-judgment interest at the maximum legal rate;

7.      Award equitable, injunctive, and declaratory relief, including but not limited to declaring Defendants' misconduct unlawful and enjoining Defendants, their officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on their behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts competition in the manner as alleged hereinabove; and

8.      Award such further and additional relief as the Court deems just and proper.


June 14, 2024

*/s/ Jonathan M. Shapiro*
Jonathan M. Shapiro
**AETON LAW PARTNERS LLP**
311 Centerpoint Drive
Middletown, Connecticut 06475
Telephone: (860) 724-2160
jms@aetonlaw.com

Matthew W. Ruan*
Douglas A. Millen*
**FREED KANNER LONDON
& MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com
dmillen@fklmlaw.com

Michael B. Eisenkraft*
Christopher J. Bateman*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, Suite 1400
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: *(212) 838-7745*
meisenkraft@cohenmilstein.com
cbateman@cohenmilstein.com

Brent W. Johnson*
Nathaniel D. Regenold*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
bjohnson@cohenmilstein.com
nregenold@cohenmilstein.com

Daniel J. Walker*
**BERGER MONTAGUE PC**
1001 G Street, NW Suite 400 East
Washington, DC 20001
Phone: (202) 559-9745
dwalker@bm.net

Eric L. Cramer*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103 Phone: (215) 875-3000
*ecramer@bm.net*

Frank R. Schirripa\*
Scott Jacobsen\*
**HACH ROSE SCHIRRIPA & CHEVERIE
LLP**
112 Madison Avenue, 10th Floor
New York, NY 10016
(212) 213-8311
fschirripa@hrsclaw.com
SJacobsen@hrsclaw.com.

*Attorneys for Plaintiffs Estuary Transit District
and Teamsters 671 Health Service & Insurance
Plan and the Proposed Class*

\* Pro hac vice motion forthcoming